1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

ANNETTE CADET,

CASE NO. C19-1953JLR

11

                        Plaintiff,

ORDER DISMISSING CASE FOR
LACK OF JURISDICTION

        v.

12

SNOQUALMIE CASINO,

13

                        Defendant.

14

15

16

## I.    INTRODUCTION

17

Before the court is Defendant Snoqualmie Casino's ("Snoqualmie" or "the

18

Casino") response to the court's order to show cause why it is entitled to tribal sovereign

19

immunity.  (Snoqualmie OSC Resp. (Dkt. # 16).)  Although Plaintiff Annette Cadet

20

opposed Snoqualmie's initial motion to dismiss (5/1/20 Cadet Resp. (Dkt. # 14)), she did

21

not file a response to the court's order to show cause (*see generally* Dkt.).  The court has

22

considered Snoqualmie's response to the order to show cause, the relevant portions of the

1  record, and the applicable law.  Being fully advised, the court concludes that Snoqualmie

2  is entitled to tribal sovereign immunity and DISMISSES this case for lack of

3  subject-matter jurisdiction.

## II.    BACKGROUND

### A.    Factual Background

6      Ms. Cadet lives in Bellevue, Washington.  (*See* 2d MFP (Dkt. # 5) at 1; 5/1/20

7  Cadet Resp. at 6.)[1]  On or about May 3, 2018, she paid Snoqualmie ten dollars for

8  round-trip transportation via bus from Seattle to the Casino.  (Compl. (Dkt. # 7) at 5; *but*

9  *see* 5/1/20 Cadet Resp. at 1 (claiming the events took place on May 2, 2018).)  However,

10  she missed the last bus home that night and had no money to take a taxi.  (5/1/20 Cadet

11  Resp. at 1.)  She asked the Casino's security personnel for a ride home, and they told her

12  she "could wait for the next bus in the morning."  (*Id.*)  Ms. Cadet avers that one of the

13  Casino's patrons pointed at Ms. Cadet and complained about her presence, and the

14  Casino's security personnel asked Ms. Cadet to leave at around 2:00 a.m.  (*Id.* at 1-2.)

15  Ms. Cadet claims she told the security guards that she had come on the bus and asked for

16  a "courtesy ride," but the Casino called the police instead.  (*Id.* at 2.)

17      Three officers from the Snoqualmie Police Department soon arrived, and Ms.

18  Cadet asked them for a ride home.  (*Id.*)  Ms. Cadet claims one officer told her that he did

19  not care about her situation and that she lived too far away to give her a ride.  (*See id.*)  It

20  is unclear what exactly happened next, but Ms. Cadet, who is black, claims that

21

22      [1] Unless otherwise noted, all page numbers throughout this order refer to those provided
by the court's electronic filing system ("ECF").

1   Snoqualmie's staff assisted the police officers in degrading, abusing, assaulting, and

2   injuring her because of her complexion.  (*See id.* at 2-3.)  Ms. Cadet says that she

3   experienced "physical, emotional[,] and mental pain . . . after those inhuman[e]

4   treatments.  I was treated as a real criminal."  (*Id.* at 2.)  Ms. Cadet asserts that "[t]he

5   Snoqualmie Casino caused the police to torture[] me.  They injured my right shoulder,

6   left arm[,] left knee, [and] hit my head causing [a] nose bleed [and a] cut lip.  One

7   [officer] was kneeling on top of me."  (*Id.* at 3.)

8          Ms. Cadet's complaint alleges the following:

9          On [May 3, 2018,] at [the] Snoqualmie Casino, the defendant[]:  (1)
           performed acts that a person of ordinary prudence in the same or similar
10         circumstances would not have done; or (2) failed to perform acts that a person
           of ordinary prudence would have done under the same or similar
11         circumstances because . . . [the] Casino provided transportation and at [2:00
           a.m.] refused to transport me [back to Seattle] after I lost all [of my] money
12         and [had] no other options.

13   (Compl. at 5.)  Furthermore, Ms. Cadet alleges that she lost her job, lost wages,

14   experienced "[r]acial discrimination," suffered "[e]motional stress," and endured

15   "[p]ersonal injuries," including a dislocated shoulder, due to the Casino's actions.  (*Id.* at

16   5-6.)  She is requesting $100,000.00 in damages from Snoqualmie.  (*Id.* at 5.)

17   **B.    Procedural History**

18          On December 30, 2019, Ms. Cadet filed suit *pro se* against Snoqualmie, alleging

19   negligence and discrimination.  (*Id.* at 1, 5.)  Snoqualmie responded to Ms. Cadet's

20   complaint with a motion to dismiss.  (*See generally* MTD (Dkt. # 9).)  Snoqualmie

21   argued that there were three reasons Ms. Cadet's complaint should be dismissed:  (1) lack

22   of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because Snoqualmie has

1  sovereign immunity and Ms. Cadet failed to identify a basis for jurisdiction in the

2  complaint; (2) failure to state a claim on which relief can be granted under Fed. R. Civ. P.

3  12(b)(6); and (3) improper service under Fed. R. Civ. P. 12(b)(5).  (*Id.* at 1.)

4      Because Snoqualmie raised questions about the court's subject-matter jurisdiction

5  in its motion to dismiss but failed to adequately support its argument regarding the

6  Casino's entitlement to tribal sovereign immunity, the court struck Snoqualmie's motion

7  to dismiss and issued an order to show cause regarding the Casino's tribal immunity and

8  the court's subject-matter jurisdiction.  (*See* 5/1/20 Order (Dkt. # 15) at 2-4.)  Snoqualmie

9  responded to the court's order, arguing that the Casino functions as an "arm" of the

10  Snoqualmie Indian Tribe ("the Tribe") and shares in its sovereign immunity.  (*See*

11  Snoqualmie OSC Resp. at 4-7.)  Snoqualmie also provided copies of the Tribe's

12  Snoqualmie Entertainment Authority Act of 2006 ("SEA Act"), Gaming Act, Tort Claims

13  on Snoqualmie Tribal Lands Act ("Tort Claims Act"), Judiciary Act, and constitution.

14  (Digre Decl. (Dkt. # 17) ¶¶ 3-4, Exs. A[2] ("Acts"), B ("Snoqualmie Const.").)

15  Snoqualmie asserts that these documents establish its immunity from Ms. Cadet's suit.

16  The court now considers Snoqualmie's response.

17  //

18  //

19  //

20  //

21

22

---

[2] References to the four tribal statutes within this exhibit include the ECF page number as well as a parenthetical reference to the specific section of the relevant act.  For example:  (Acts at 2 (SEA Act § 3.0)).).

# III.   ANALYSIS

## A.   Whether Snoqualmie Has Waived Its Sovereign Immunity

### 1. Legal Standards

Before the court can consider the merits of Ms. Cadet's complaint, it must establish whether it has subject-matter jurisdiction in this case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).  Subject-matter jurisdiction is "the courts' statutory or constitutional power to adjudicate the case." *Id.*  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is [the] power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869)); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Given that "[t]ribal sovereign immunity is a quasi-jurisdictional issue," the court cannot proceed without first determining whether it has jurisdiction in this case. *See Pistor v. Garcia*, 791 F.3d 1104, 1115 (9th Cir. 2015) ("Tribal sovereign immunity is a quasi-jurisdictional issue that, if invoked at the Rule 12(b)(1) stage, must be addressed and decided.").

Federal courts typically lack subject-matter jurisdiction over Indian tribes absent congressional authorization or a waiver from the tribe. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).  "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. . . . '[W]ithout congressional authorization,' the 'Indian Nations are exempt from suit.'" *Id.* (quoting *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940)).

"Thus, [the Supreme Court] [has] time and again treated the 'doctrine of tribal immunity [as] settled law' and dismissed any suit against a tribe absent congressional authorization (or a waiver)."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998)).

A tribe's sovereign immunity extends to a tribal enterprise only if that enterprise "functions as an arm of the tribe." *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) ("This immunity extends to business activities of the tribe, not merely to governmental activities.").  The Ninth Circuit considers the following five factors when "determining whether an entity is entitled to sovereign immunity as an 'arm of the tribe'":

> (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.

*White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014) (quoting *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010)).

A tribe can waive its sovereign immunity, but the waiver must be "unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58-59 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) ("A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'"); *White*, 765 F.3d at 1026 (quoting *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994)) ("A voluntary waiver by a tribe must be 'unequivocally expressed.'"); *see also Bay Mills*, 572 U.S. at 782-83 (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S.

411, 418 (2001)) ("[U]nless Congress has 'unequivocally' authorized Michigan's suit [against the Bay Mills Indian Community for opening a casino], it must be dismissed."). Without an unequivocal waiver of sovereign immunity from a tribe or an authorization from Congress, federal courts lack the requisite subject-matter jurisdiction to rule on matters involving tribes.  *See, e.g.*, *Santa Clara Pueblo*, 436 U.S. at 58-59.

    2.  <u>Application</u>

       *a.  Whether the Casino Is an "Arm of the Tribe"*

According to the Tribe's constitution, the Tribe is "immune from suit except to the extent that the Tribal Council expressly and unambiguously waives its sovereign immunity." (Snoqualmie Const. art. I, § 3.)[3]  To determine whether the Tribe's sovereign immunity extends to the Casino, the court must first consider the factors put forth in *White* and conduct an "arm of the tribe" analysis.  765 F.3d at 1025.

       i.  Factor One:  Method of Creation

The Casino is wholly owned and operated by the Tribe and is organized and operated pursuant to the Tribe's laws.  (Snoqualmie OSC Resp. at 5; *see generally* SEA Act.)  The SEA Act places the power over affairs of the Casino in the hands of the Snoqualmie Entertainment Authority, whose members are the elected members of the Snoqualmie Tribal Council.  (Acts at 5, 8 (SEA Act §§ 5.0, 8.0).)  The SEA Act also makes clear that the Tribe "resolved to develop [the Casino]," which would be "located on the initial reservation of the Tribe[] and operated by the Tribe."  (*Id.* at 2 (SEA Act

---

[3] This section can be found on ECF page two of this exhibit.

1  § 3.0).)  Snoqualmie was formed by the Tribe pursuant to the SEA Act, a resolution

2  codifying the Tribe's authority over the Casino.  Thus, the first *White* factor favors the

3  Casino functioning as an "arm of the Tribe."  *See White*, 765 F.3d at 1018, 1025 (finding

4  that a tribal repatriation committee "formed . . . by tribal resolutions from each of its

5  twelve . . . member tribes" functioned as an "arm of the tribe").

6              ii.  Factor Two:  Purpose

7          The Tribe created the Casino "to develop an upscale gaming and entertainment

8  facility, with related amenities, on Indian lands of the Tribe."  (Acts at 2 (SEA Act

9  § 3.0).)  "[T]he Casino's creation was authorized pursuant to [the Indian Gaming

10  Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 (2018),] a federal law intended to

11  promote tribal self-sufficiency."  (Snoqualmie OSC Resp. at 6; *see also* Acts at 2 (SEA

12  Act § 3.0); Acts at 26 (Gaming Act § 6.01).)  Moreover, IGRA states that "net revenues"

13  from tribal gaming operations may only be used to fund tribal operations, promote a

14  tribe's general welfare or economic development, or to donate to charity or to help fund

15  local government agencies.  25 U.S.C. § 2710(b)(2)(B).  It is clear that the Casino

16  generates revenue for the Tribe to promote tribal prosperity and self-sufficiency.  Thus,

17  the second *White* factor favors the Casino functioning as an "arm of the Tribe."  *See*

18  *White*, 765 F.3d at 1025; *see also Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 726

19  (9th Cir. 2008) (finding that a tribal casino functioned as an "arm of the tribe" in part

20  because it provided funds for the tribe's treasury).

21  //

22  //

iii. Factor Three:  Structure, Ownership, and Management

The Tribe's Gaming Act provides that "[t]he Tribe shall have the sole proprietary interest in and responsibility for the conduct of any [g]aming [o]peration authorized by this Act."  (Acts at 26 (Gaming Act § 5).)  This is consistent with IGRA's requirements that the Tribe "have the sole proprietary interest and responsibility for the conduct of any gaming activity."  25 U.S.C. § 2710(b)(2)(A).  Moreover, one of the SEA Act's purposes is to "confirm that the Tribe's ownership, management and supervisory authority over the [g]aming [b]usiness and the [g]aming [a]ssets will continue to be exercised by and through the Tribal Council on behalf of the Tribe."  (Acts at 2 (SEA Act § 3(b)).)  Thus, the third *White* factor favors the Casino functioning as an "arm of the Tribe."  *See White*, 765 F.3d at 1025; *see also Allen*, 464 F.3d at 1047 (finding that a tribal casino functioned as an "arm of the tribe" in part because it was owned and operated by the tribe).

iv. Factor Four:  Intent with Respect to the Sharing of Sovereign Immunity

The Tribe's Judiciary Act states that "all [t]ribal agencies, committees, departments, entities or employees of any kind shall be immune from suit for any acts or omissions done during the performance of [t]ribal duties."  (Acts at 63 (Judiciary Act § 10.0).)  This broad grant of immunity reflects the Tribe's intent to share its tribal sovereign immunity with "all tribal . . . entities . . . of any kind," which includes the Casino.  Indeed, as the *Allen* court noted, cloaking a tribal casino with tribal sovereign immunity "directly protects the sovereign [t]ribe's treasury, which is one of the historic purposes of sovereign immunity in general."  *See Allen*, 464 F.3d at 1047.  Thus, the Tribe is clear in its intent that the Casino generally share in its sovereign immunity, and

1   the fourth *White* factor favors the Casino functioning as an "arm of the Tribe." *See*

2   *White*, 765 F.3d at 1025.

3                       v.   Factor Five:  Financial Relationship

4          The Casino's net revenues go solely to the Tribe and must be used for the

5   purposes articulated by IGRA.  (Acts at 26 (Gaming Act § 6.01) ("Net Revenues from

6   Tribal Gaming Activities shall be used only for the following purposes:  (i) to fund Tribal

7   government operations and programs, (ii) to provide for general welfare of the Tribe and

8   its members, (iii) to promote Tribal economic development, (iv) to donate to charitable

9   organizations, or (v) to help fund operations of local government agencies.").)  Just as in

10  *Cook*, where the "capital surplus from the casino" went to the tribe's treasury, the Casino

11  generates revenue for the tribe that can only be used in specific manners to promote tribal

12  prosperity and self-sufficiency. *See Cook*, 548 F.3d at 729.  Thus, the fifth *White* factor

13  favors the Casino functioning as an "arm of the Tribe." *See White*, 765 F.3d at 1025.

14                      vi. Conclusion on "Arm of the Tribe" Analysis

15         Just as in *Cook* and *Allen*, the Casino is owned and operated by the Tribe on tribal

16  land, and its purpose is to promote tribal prosperity by providing revenue for the Tribe.

17  *See Cook*, 548 F.3d at 729 ("[T]he tribal corporation is wholly owned and managed by

18  the [t]ribe."); *Allen*, 464 F.3d at 1047 ("[T]he casino, which was wholly owned and

19  operated by the [t]ribe, functioned as an arm of the [t]ribe.").  Moreover, the Tribe has

20  intended to extend its sovereign immunity to its enterprises, including the Casino.  Thus,

21  each factor in *White* favors the conclusion that the Casino functions as an "arm of the

22

1  Tribe," and the Casino is therefore immune from suit unless the Snoqualmie Tribal

2  Council has expressly waived sovereign immunity in this case.

3             *b.   Whether the Casino Has Waived Its Sovereign Immunity*

4         To remain consistent with the controlling case law and the Tribe's constitution,

5  any waiver of Snoqualmie's sovereign immunity must be clear and unambiguous.  *See*

6  *Santa Clara Pueblo*, 436 U.S. at 58-59.  In this case, the waiver must "unequivocally"

7  allow the Tribe to be sued in federal court.  *See Bank of Okla., Nat'l Ass'n v. Muscogee*

8  *(Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir. 1992) (citing *Santa Clara Pueblo*, 336

9  U.S. at 49, 58) (holding that a waiver of sovereign immunity was ambiguous because the

10  waiver's terms "mentioned tribal court but not federal district court").  "[T]he critical

11  question is not whether the Tribe waived immunity, but rather, 'the extent to which that

12  immunity was waived.'"  *Mo. River Servs., Inc. v. Omaha Tribe*, 267 F.3d 848, 852 (8th

13  Cir. 2011) (quoting *Namekagon Dev. Co. v. Bois Forte Res. Hous. Auth.*, 517 F.2d 508,

14  510 (8th Cir. 1975)).  A waiver of sovereign immunity "is altogether voluntary on the

15  part of [a tribe]," meaning "[a tribe] may prescribe the terms and conditions on which it

16  consents to be sued, and the manner in which the suit shall be conducted."  *Id.* (quoting

17  *American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d

18  1374, 1378 (8th Cir. 1985)).

19         The Tribe's Tort Claims Act, which was enacted by the Snoqualmie Tribal

20  Council, provides a limited waiver of sovereign immunity.  The Act states that "[t]he

21  sovereign immunity of the Tribe is waived only in the following instances," including

22  "[i]njuries proximately caused by the negligent acts and/or omissions of the Tribe, its

1    agents, employees or officers."  (Acts at 52 (Tort Claims Act § 6.0(d)).)  There is little

2    doubt that Ms. Cadet has filed claims alleging "[i]njuries proximately caused by the

3    negligent acts and/or omissions of the Tribe, its agents, employees or officers."  (*See*

4    Compl. at 1, 5-6.)  Indeed, Snoqualmie essentially concedes as much in its motion to

5    dismiss and response to the court's order to show cause.  (*See* MTD at 4-5 ("Plaintiff

6    generally alleges a negligent or wrongful act or omission by the Tribe or its officers,

7    agents, or employees.  Accordingly, the Tort Claims Act provides her exclusive remedy

8    for an action against the Tribe for her alleged injuries."); Snoqualmie OSC Resp. at 8.)

9            However, the question is whether this waiver extends to Ms. Cadet's federal court

10   action.  The Tribe's limited waiver of tribal sovereign immunity does not unequivocally

11   allow Snoqualmie to be sued in a federal district court.  *See Bank of Okla.*, 972 F.2d at

12   1171.  The Tort Claims Act does not mention federal court jurisdiction at all, but it does

13   state that the Act "is not intended to be a general waiver of the Tribe's sovereign

14   immunity, and it shall be narrowly and strictly construed."  (Acts at 50 (Tort Claims Act

15   § 3.0).)  The Tort Claims Act further states that it "sets forth the exclusive manner in

16   which tort claims involving the Snoqualmie Indian Tribe shall be filed, administered and

17   adjudicated" and that the waiver is "expressly conditioned upon the claimant's full and

18   complete compliance with all of the procedures set forth in this chapter."  (*Id.* at 50 (Tort

19   Claims Act § 3.0).)  Moreover, "[a] tort claim for monetary damages against the Tribe

20   shall be forever barred unless . . . [it] is commenced in Tribal Court in accordance with

21   the provisions of this Chapter."  (*Id.* at 56 (Tort Claims Act § 12.0(e)).)  Finally, the Act

22   contains detailed procedural rules that must be followed to file tort claims in the

1    Snoqualmie Tribal Court, indicating that the Tribal Council intended the waiver to apply

2    to suits filed in tribal court and not federal district court.  (*See id.* at 53-54 (Tort Claims

3    Act § 10.0).)

4            Thus, the waiver of sovereign immunity located within the Tort Claims Act does

5    not unequivocally indicate that the Tribe has waived its immunity from suits filed in

6    federal court; instead, the waiver provides a remedy to those who are harmed while on

7    tribal grounds through the tribal court system.  The absence of a clear and unequivocal

8    waiver to be sued in federal court means that the Tribe's waiver of sovereign immunity

9    does not extend to Ms. Cadet's suit.  Therefore, the Tribe's immunity remains intact, and

10   the court lacks subject-matter jurisdiction in this case.  *See Bank of Okla.*, 972 F.2d at

11   1171.

12           Moreover, even if Ms. Cadet were entitled to file suit against Snoqualmie in

13   federal court, she would still have to comply with the procedural requirements set forth in

14   the Tribe's Tort Claims Act.  (*See* Acts at 53-55 (Tort Claims Act § 10.0).)  The Tort

15   Claims Act states that the waiver is "expressly conditioned upon the claimant's full and

16   complete compliance with all of the procedures set forth in this chapter."  (*Id.* at 50 (Tort

17   Claims Act § 3.0).)  There is no evidence on the record that Ms. Cadet complied with

18   these procedural requirements.  (*See generally* Dkt.)  Ms. Cadet must show, for example,

19   that she provided "written notice of the claim to the Secretary of the Tribal Council and

20   the Tribe's In-House Legal Counsel" "no later than one hundred and eighty (180) days

21   after the act or omission occurred giving rise to the injury."  (Acts at 53-54 (Tort Claims

22   Act §§ 10.0(a), 10.0(c)(1)).)  Thus, even if Ms. Cadet could bring her case in federal

ORDER - 13

court, the Tribe conditioned its waiver of sovereign immunity upon Ms. Cadet's strict adherence to several procedural requirements, and Ms. Cadet fails to establish that she satisfied those requirements.

In sum, the Casino functions as an "arm of the Tribe," and the Tribe has not unequivocally waived its sovereign immunity in this case.  Therefore, tribal sovereign immunity compels the court to dismiss this case for lack of subject-matter jurisdiction.

## IV.   CONCLUSION

For the reasons set for above, the court DISMISSES this case without prejudice for lack of subject-matter jurisdiction.

Dated this 25th day of June, 2020.

JAMES L. ROBART
United States District Judge